LOUISVILLE AND NASHVILLE RAILROAD COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Louisville & N. R. Co. v. Commissioner
Docket No. 7249-73.
United States Tax Court
T.C. Memo 1987-616; 1987 Tax Ct. Memo LEXIS 661; 54 T.C.M. (CCH) 1352; T.C.M. (RIA) 87616; December 21, 1987. George K. Dunham,[1] for the petitioner. William R. McCants, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In a statutory notice of deficiency, dated July 2, 1973, respondent determined a $ 1,867,956.25 deficiency *662 in income tax for petitioner's 1966 taxable year. [2] By an amended petition, filed April 16, 1982, petitioner claimed additional deductions for the 1966 year attributable to obsolescence of its grading and tunnel bores, which had not been claimed on the income tax return filed. Most of the numerous issues set forth in the statutory notice of deficiency and pleadings have been conceded or settled by the parties. The following issues remain for our consideration: (1) Whether petitioner is entitled to depreciate railroad grading and tunnel bores; (2) whether petitioner correctly valued salvaged relay rail; [3] (3) whether petitioner is entitled to a casualty loss deduction for the cost of replacing grading destroyed by Hurricane Betsy during 1965; (4) what amount of "dead haul cost" is petitioner required to capitalize as part of its freight car rebuilding program. This case has been consolidated with the Seaboard Coast Line Railroad Company, Successor by Merger to Atlantic Coast Line Railroad Company (SCL) (docket Number 4870-75) for purposes of briefing and, to a limited extent, for trial. [4] See Seaboard Coast Line R.R. v. Commissioner,T.C. Memo. 1987-615. *663 FINDINGS OF FACT General Findings
The parties have entered into stipulations of facts, along with attached exhibits, which we incorporate by this reference. Petitioner, Louisville and Nashville Railroad Company (L&N), was incorporated under the laws of the State of Kentucky on March 5, 1850, and it maintained its principal place of business during the year in question and at the time of the filing of its petition at Louisville, Kentucky. The first train was run from Louisville, Kentucky, to Nashville, Tennessee, in 1859. There was 265 miles of track when expansion was discontinued due to the Civil War. The L&N reached 5,000 miles of trackage in 1915, when its growth period ended. Although they have hauled both passengers and freight, freight has been the most important part of the business. The line runs through the states of Ohio, Indiana, Illinois, Missouri, Kentucky, Virginia, North Carolina, Alabama, Georgia, Mississippi and Florida. The two main lines run from Cincinnati, Ohio, south to Atlanta, Georgia, and from Cincinnati, Ohio, southwest to Birmingham and Montgomery, Alabama, to Pensacola, Florida, and then to New Orleans, Louisiana. Early in its history, *664 L&N hauled cotton, material for bale rope and bagging, bacon, salt pork, bulk meats, flour, whiskey, tobacco, mules and other merchandise. Eventually the coal fields of Kentucky and to a lesser extent Alabama were the most important parts of the line and coal accounted for as much as 50 percent of L&N's business. Initially, coal was shipped north to the industrial centers, such as Cincinnati and subsequent to that when southern areas became more industrialized, coal was shipped south to cities, such as Birmingham for its steel industry. The importance of coal and hence the success of the L&N line has had a cyclical history. The L&N, as it existed during the year in question, was the resulting conglomeration of more than 50 different companies. L&N passenger revenue went from about 18 percent in 1924 to less than 1 percent in 1969 (of total revenue). During the taxable periods in issue, L&N was a Class I rail carrier regulated by the Interstate Commerce Commission (ICC) and was required to file an annual operating report in accordance with "Annual Report Form A." L&N's books were maintained under the accrual method of accounting and in accordance with the rules prescribed by *665 the ICC in the Uniform System of Accounts for Railroad Companies, 49 C.F.R. 1200 et seq (1986). A physical inventory was taken of all railroads pursuant to an ICC act where all rail property could be identified on corporate records as well as the book cost, cost of reproduction and cost of reproduction less depreciation, all as of the year 1913. The inventory of L&N was completed in 1918 and since then the inventory has been used for regulatory and tax reporting purposes. Grading and Tunnel Bores
Railroad lines are constructed on right-of-way along strips of land which vary in width from 100 to 400 feet. The roadbed, on which the tracks are placed, is generally narrower than the right-of-way and constitutes an improvement placed upon land. Grading provides a smooth and shaped roadbed for the tracks and is comprised of open cuts (excavations) and fills (embankments). Grading can also involve clearing and construction of drainage ditches, water channel changes and the sloping of unstable ground. Grading may include excavations to divert streams or embankments to elevate the track above normal ground level. In mountainous areas, it is often necessary to cut away earth *666 from the hillside just above the roadbed and deposit the removed earth just below the roadbed to provide a sufficiently wide level path. Grading expenditures represent the cost of clearing the land, filling the terrain and then smoothing and shaping it to provide a relatively straight and level foundation for the track. Grading costs are carried in ICC Account 3. [5] Grading costs vary depending on the type of terrain, degree of curvature and the degree of roadway incline. The cost of grading is reflected as an "addition or betterment" in "completion reports." A completion report is also prepared when grading is retired. Completion reports are numbered to correspond Authority for Expenditures (AFE) which are project records for additions, betterments and retirements that are approved by appropriate corporate authority. The completion reports, AFE's and ICC inventories constitute the basic accounting records for grading and tunnel bores, as well as other track assets. Tunnels are subsurface structures in the nature of an improvement similar *667 to grading. Tunnel hole construction, consisting of the tunnel and tunnel lining, is separately accounted for under ICC rules and referred to as a "tunnel bore." The cost of digging a tunnel entails earth and rock movement, lining and lighting, all of which are reported in ICC Account 5. Grading and tunnel bores are assets used in petitioner's operation of a railroad and are considered an integral part of providing transportation service. If a railroad abandons [6] service of one of its lines, grading and tunnel bores (and other track facilities) are generally retired on the railroad's records. The obsolescence of grading and tunnel bores is attributable to physical deterioration and line abandonments because of operating factors and external economic forces. Grading may suffer physical deterioration. The weight of railroad equipment on the tracks and water flowing *668 over and around grading causes physical deterioration to grading. Ballast, which is generally placed upon grading to receive the track structure, may replace grading because of the weight of and upon the ballast. The quality of grading has improved since the nineteenth century. Some nineteenth century grading may have pockets which need improvement. Line abandonments are the largest source of grading retirements. The amount and value of traffic, cost of maintenance and possible public opinion or reaction are considered in any decision to abandon a line. Railroads are built to meet economic needs and markets existing at the time of construction. The rail plant, being fixed in location, is not readily adjustable to shifts in market or geographical demand. The potential physical life of the rail plant may exceed market and geographical demand. The predominant form of transportation prior to railroads was provided by use of bodies of water and navigable waterways. Prior to the 1860's the railroad industry in this country usually provided a link between established water-based transportation. Most of the railroads during this period were of a relatively short distance and were *669 not connected to each other. As population moved west, away from natural and man-made waterways, more railroads were begun, but they were generally special-purpose, short-distance lines within the confines of the jurisdiction (states) which regulated them. As a result, around 1860, most of the railroads were independently owned, unconnected, short lines. Following the Civil War, the railroads expanded and connecting railroads were chartered. Moving into the twentieth century, the railroads began to experience competition from the trucking industry which enjoyed increased interstate highway construction into the years in question. In 1925 about 80 percent of inter-city freight was moved by railroads and only about 1 percent by truck. As of 1963 inter-city rail freight had dropped to 43 percent and trucking had increased to 23 percent. Railroad passenger traffic went from more than 20 percent of all inter-city travel in 1926 to a little over 2 percent in 1963. Competition, market and geographical factors and other economic forces increased the number of railroad line retirements nationwide. Track system mileage of Class I railroads decreased from 211,459 in 1955 to 196,479 *670 in 1970, a retirement rate approximating 1,000 miles per year. By 1984, Class I railroad mileage fell to 151,998, reflecting a retirement rate approximating 3,000 miles per year during the 1970 to 1984 period. Grading retirements may also be occasioned by conformance to technological advances, new maintenance techniques and attempts to improve efficiency. Examples of these concepts include the use of larger or longer diesel trains, straightening of tracks, and reducing gradients and curves. Tunnels can become obsolete because the height may not accommodate higher profile freight cars. Urbanization may force the retirement and relocation of track. Finally, market demand or competition of railroads with parallel lines may cause mergers which result in abandonment and retirement of redundant lines. ICC accounting rules define property retired as: "units of property which have been removed, sold, abandoned, destroyed, or which for any cause have been permanently withdrawn from service; also minor items of property not replaced." The L&N system was made up of a number of smaller railroads which were constructed beginning in the middle of the nineteenth century through the early *671 part of the twentieth century and which merged prior to the taxable years in question. The system ran roughly from Louisville, Kentucky, in the north to New Orleans, Louisiana, in the south, eastward to Atlanta, Georgia, and westward to East St. Louis, Missouri, and Memphis, Tennessee. The terrain is generally hilly or mountainous in the north and east and becomes relatively flat as it runs south and approaches the Gulf of Mexico. The construction of L&N's track in hilly or mountainous areas necessitated numerous curves, gradients and tunnels. The expansion of L&N's trackage and business tapered off in the early part of the twentieth century when increased competition from automobiles, trucks and improved roads had begun. In 1924 passenger service represented about 20 percent of total revenue, whereas it represented less than 3 percent by 1964. Competition from the trucking and barge industries reduced the amount of livestock, poultry (less than a full carload) and automobile freight of L&N. The decline of the Birmingham, Alabama, steel industry led to the abandonment of track in that area. Higher profile freight cars to carry automobiles and piggyback (truck trailers) caused *672 the abandonment of lines and tunnels which could not accommodate the larger equipment. Abandonment also occurred from inability to accommodate increased weight, which necessitated removal of substandard grading and line straightening. After the Seaboard Coast Line (SCL) acquired the controlling interest in L&N, subsequent to 1975, track of L&N which was parallel or served the same markets as SCL track was abandoned. As a result of competitive forces in the marketplace, changes in technology and the need to condense into a more efficient competitive system, grading and tunnel bores were retired. The additions, retirements and balances of the grading account (ICC Account Number 3) for the period 1918 to 1965 were as follows: Year
Additions
Retirements
Balance
1918
$   785,779
$   175,211
$  84,909,614
1919
1,646,061
63,663
86,492,012
1920
827,400
30,106
87,289,306
1921
362,792
100,488
87,551,610
1922
936,924
63,886
88,424,648
1923
347,443
53,028
88,719,063
1924
1,014,060
73,567
89,659,556
1925
1,474,248
151,792
90,982,012
1926
1,730,751
120,918
92,592,845
1927
2,284,235
183,836
94,692,244
1928
1,100,773
318,473
95,474,544
1929
572,299
194,345
95,852,498
1930
1,829,332
178,626
97,503,204
1931
141,452
87,530
97,557,126
1932
87,856
1,076,920
96,568,062
1933
95,272
340,652
96,322,682
1934
37,386
550,731
95,809,337
1935
43,822
86,555
95,766,604
1936
57,384
440,379
95,383,609
1937
196,160
263,989
95,314,780
1938
65,814
41,991
95,339,603
1939
91,498
131,386
95,299,715
1940
218,530
49,267
95,468,978
1941
145,366
292,450
95,321,894
1942
227,285
1,306,245
94,242,934
1943
194,698
214,180
94,223,452
1944
2,253,398
212,432
96,264,418
1945
1,998,958
539,757
97,723,619
1946
1,176,122
241,981
98,657,760
1947
269,039
418,954
98,507,845
1948
212,650
10,718
98,709,777
1949
2,067,563
23,729
100,753,611
1950
182,158
30,872
100,904,897
1951
602,540
124,802
100,382,635
1952
300,305
383,351
100,299,589
1953
241,219
77,112
101,463,696
1954
520,185
159,241
101,824,640
1955
221,564
55,892
101,990,312
1956
345,888
34,147
102,302,053
1957
385,620
13,618
102,674,055
1958
2,298,496
85,821
104,886,730
1959
208,139
54,090
105,050,779
1960
205,392
127,501
105,118,670
1961
520,043
149,607
105,489,106
1962
2,377,835
10,432
107,856,509
1963
5,056,978
94,693
112,818,794
1964
770,727
188,751
113,400,770
1965
690,806
42,306
114,049,270
*673 The additions, retirements and balances of the tunnel bore account (ICC Account Number 5) for the years 1918 to 1965 were as follows: Year
Additions
Retirements
Balance
1919
$   6,457
$    -   $ 5,108,974
1924
222,830
-   5,331,804
1925
116,617
10,260
5,438,161
1927
174,796
82,392
5,530,565
1928
276,616
65,818
5,741,363
1930
848,275
-   6,589,638
1932
-   46,415
6,543,223
1934
-   50,401
6,492,822
1937
4,572
-   6,497,394
1938
12,363
-   6,509,757
1942
107
98,355
6,411,509
1943
29,714
-   6,441,223
1944
77,818
-   6,519,041
1945
12,793
-   6,531,834
1946
-   13,668
6,518,166
1947
1,665
-   6,519,831
1949
74,621
-   6,594,452
1952
-   26,635
6,567,817
1956
31,589
-   6,599,406
1962
69,193
-   6,668,599
1964
14,735
58,599
6,624,735
1965
-   -   6,624,735
The tax bases of L&N's grading and tunnel bores was $ 123,293,723 and $ 6,593,312, respectively, at the beginning of the 1965 taxable year. In its accounting practices, L&N did not assign a salvage value to grading upon retirement. Two life *674 studies were utilized by petitioner in this case. An actuarial study by William M. Stout (Stout) and a simulated plant method (SPR) study by Paul H. Raab (Raab). [7]
Where adequate retirement history is available, it may be mathematically converted into survivor ratios which can be compared to established survivor curves reflecting patterned asset life. This method has been called the "actuarial method." It proceeds with the use of a band of existing retirement experience for a period of years. The experience in the known band of years is related to all surviving assets exposed to the risk of retirement. This is accomplished by comparison of the band analysis to the established survivor curves, which based on the limited information, will provide a likely pattern of life expectancy. A particular series of survivor curves used for this type of *675 comparison are known as "Iowa curves" because they were developed at Iowa State University [8] and have been used for many years to assist in the projection of life expectancy of long-life assets. The mechanics of this actuarial method requires first determining when property was retired and that same property was installed. Then a retirement ratio is determined and properties are placed in various bands and the percentage surviving from each bank is determined. The resultant percentages are plotted on a graph to form a survivor curve [9] which is matched visually and by means of statistical analysis to the various families of Iowa curves. The Iowa curves are in three general families: right moded, left moded and symmetrically moded curves. [10] There are numerous life curves within each of the three families and they must be selected by someone with expertise in the use of the Iowa curves and knowledge of the particular assets being retired. The expert smoothes and extrapolates the stub curve to match it to a particular curve *676 within one of the three Iowa curve families. Stout, of Gannett Fleming Valuation and Rate Consultants, Inc., has expertise in the analyses of asset life and depreciation rates. Stout has testified on numerous occasions before public service commissions concerning depreciation on behalf of utility and railroad companies. Stout has no expertise in statistics. Stout reviewed L&N's historical retirement and development data and physically observed some of the grading and tunnel bores. Using Iowa-type survivor curves, Stout used his expertise and background in L&N data to smooth and extrapolate the stub survivor curve in order to select the most appropriate and representative *677 Iowa curve upon which to base the useful life of the grading and tunnel bores in question. Stout also used an objective measure in the form of a least difference squared mathematical technique, in addition to the application of his judgment in the more subjective visual fitting of the proper curve. Stout also compared his finding with the finding of other reports utilized in prior litigation involving the same issue and his comparison indicated that his judgment fell within the range of prior decided cases. Stout concluded that the grading had an average service life of 135 years (based upon an R3, Iowa curve) with an average remaining useful life of 84.7 years and that tunnel bores had an average service life of 120 years (based upon an R3, Iowa curve) with an average remaining useful life of 60.7 years. Raab, of the accounting firm of Ernst and Whinney, possesses expertise in life analyses of long-life assets with special emphasis on the use of computers to accomplish the life analysis. Raab's professional activity involves his participation in Ernst and Whinney's "utility group" which provides consulting services to regulated industries (utilities), including depreciation *678 studies. Raab considered the physical nature of grading and tunnel bores and the forces that bear upon their life expectancy. He met with employees of petitioner and made physical observations of the track structure. He also reviewed the historical data concerning petitioner and railroads in general. Raab developed an average date of placement for all grading prior to 1918. He derived a weighted average placement of 1881. A computer program, which included the survivor ratios of the entire family of Iowa curves, was applied to the additions and balances of the grading account in order to simulate the account balances that each Iowa curve would generate from the actual data. Using this computerized approach, five specific Iowa curves that best fit three data bases were selected. The curve type and historical life estimates selected were, as follows: GRADING - INITIAL PLACEMENT YEAR
Curve Type
Life Estimate
R3
121.7
S2
125.1
L3
121.3
R4
104.5
S3
109.2
GRADING - DISTRIBUTED PLACEMENTS
Curve Type
Life Estimate
S2
131.6
R3
127.7
L3
128.9
R4
112.1
L4
113.4
TUNNEL BORES
Curve Type
Life Estimates
R3
137.7
S2
139.1
L3
136.0
R4
117.1
S3
122.6
*679 Each set of five curves was then subjected to three statistical tests to further refine which of the five was most appropriate. A conformance index, [11] retirements experience index, [12] and parameter stability tes [13] were used to refine the selection to one of the five generated survivor curves. Based upon the above analyses and tests, Raab selected the R3 survivor curve for grading and tunnel bores. Following the use of the SPR model and selection of the R3 curve, Raab attempted to verify that the curve type and life estimates appropriately represent the mortality characteristics in the grading and tunnel bore accounts for the taxable years in question, and to make an assessment of the likely changes that may occur in the mortality characteristics throughout the remainder of the life of the accounts. *680 Verification was accomplished by applying the R3 curve to the sample period and then simulating it for the actual period. The results are compared with the actual balances available and the deviations or differences were tested with the use of Theil's U-statistic (and inequality coefficient) which provides a measure of accuracy on the basis of how well the predictions from the simulation fit the actual amounts. These final verifications reflected an appropriate relationship between the simulated and actual experience. Based upon this analysis, Raab's average useful estimates were a 125 to 135-year range for grading and a 130 to 140-year range for tunnel bores. Raab's final recommendations were: grading - 130-year life with 75 years remaining; and tunnel bores - 135-year life with 75 years remaining. Raab's and Stout's analyses and reports were independently formulated. Respondent offered Nozer D. Singpurwalla (Singpurwalla), a professor at George Washington University with expertise in statistics. Singpurwalla does not perform life analyses of assets, but develops methodology techniques and can evaluate the quality of statistical techniques. Singpurwalla believes that the *681 actuarial method is generally more reliable than the simulated plant method, but that the simulated plant method is "all right" if it reflects reality well. Singpurwalla believed that the simulated plant method could be used to select a survivor curve. Singpurwalla believed that the Iowa curves or simulated plant methods were scientifically exact enough to meet his standards. Respondent also offered another statistical expert, W. Edwards Deming (Deming). Deming, like Singpurwalla, questioned the scientific exactitude of petitioner's life analyses. Petitioner's life analyses by use of actuarial and SPR methods to select an appropriate survivor curve, although not scientifically exact, possess a degree of exactitude sufficient to provide estimates of expected useful life and remaining life of grading and tunnel bores when used in conjunction with tests or safeguards to reasonably insure the conformance of available data with the projections or estimates. The average useful life of grading, for purposes of this case, is 135 years. The average remaining useful life of grading is 84.7 years, based upon a 1966 average useful life. The average useful life of tunnel bores, for purposes *682 of this case, is 135 years. The average remaining useful life of tunnel bores is 75 years, based upon a 1966 average useful life. Relay Rail
L&N used a $ 40 per ton salvage value for relay rail during the taxable years 1965 through 1968. L&N laid the following total net tons of relay rail in betterments and additions and had the following increases in inventory: 1965
1966
1967
1968
Additions - Net tons
3351.70 4412.70
3452.39
3570.49
Betterments - Net tons
1266.85 3236.44
2323.84
4771.66
Increases in inventory
(5160.33)
-   9282.40
8764.62
Total net tons
( 541.78)
7649.14
15058.63
17106.77
The parties stipulated for purposes of this case that L&N would be bound by the lesser of the salvage value for relay rail determined in the companion SCL case or the amount allowed by respondent on L&N's notice of deficiency. Casualty Loss - Hurricane Betsy
"Hurricane Betsy," which occurred during September, 1965, damaged or destroyed part of the main line of L&N's track structure within the States of Mississippi and Louisiana. [14] Thirty-three miles of main line track and 3.3 miles of passing track were extensively damaged *683 between Gentilly, Louisiana, and Bay St. Louis, Mississippi. Another 1.5 miles of track between Pensacola and Pace, Florida, were extensively damaged. The damage was caused by the flow of water from the Gulf of Mexico over the roadbed and washing the grading and ballast beyond the roadbed and carrying the rail and ties as much as 20 or 30 feet off the original location. After moving the track material back to its original roadbed, the rail and ties were replaced and the material that had been washed away was restored and the grading returned to its normal condition by the end of September, 1965. Petitioner calculated that it expended $ 3,438,078.07 to restore all properties damaged by the storm. Petitioner deducted $ 3,115,631.23, of the total amount expended, as an operating expense and the remaining $ 322,446.84 was carried as a capital expenditure. Of the amount deducted, $ 1,323,762.73 was designated for roadway maintenance and $ 48,124.24 was designated for ballast. These two amounts *684 (totalling $ 1,371,886.97) represented the cost of repairing the roadbed which consisted mainly of restoring grading and ballast washed out by the storm. The total cost of replacing the grading that had been washed out. Generally, where L&N's track structure and grading was damaged by water, the restoration was treated as a maintenance expense. Although grading is treated for ICC reporting purposes as a single unit of property, L&N maintains detailed records of specific additions and retirements. On September 24, 1965, petitioner filed a $ 3,000,000 insurance claim (not including a $ 150,000 deductible) for "windstorm" damage from Hurricane Betsy. Petitioner's policy did not cover losses due to water damage. Petitioner contended that wind was the force primarily caused the damage. During December 1966, petitioner and the insurance underwriters settled the claim for $ 2,250,000. Petitioner reported the settlement in its 1966 taxable income, even though actual receipt of the payment was not until January 4, 1967. The insurance settlement proceeds were allocated on petitioner's books and $ 458,612.05 was allocated to grading costs. The income tax basis for the destroyed grading *685 was $ 92,019.18 ($ .6628 per cubic yard times 138,834 cubic yards). Respondent disallowed the cost of restoring the grading washed away in 1965 in the amount of $ 700,775.12. Dead Haul Issue
L&N rebuilds freight cars in its South Louisville, Kentucky, shops. In a prior opinion involving petitioner, we held that labor costs for vacation pay, holiday pay, payroll taxes, and health and welfare benefits, applicable to the direct labor used in the rebuilding, should be capitalized. Louisville & Nashville Railroad Co. v. Commissioner,66 T.C. 962, 982-988, 1010-1016 (1976), affd. in part, revd. in part 641 F.2d 435 (6th Cir. 1981). [15] In that same case we also held that the costs of hauling materials used in capital programs (dead haul) should be capitalized at a rate of 6.06 percent of material costs. Louisville & Nashville Railroad Co., supra at 985-986. The 6.06 percent figure was derived from ICC studies and had been used by petitioner. Freight cars were rebuilt by petitioner, as follows: Year
Number Rebuilt
1965
3800
1966
3288 [16]
1967
3717
1968
1600
*686 OPINION Grading and Tunnel Bores
Petitioner, by means of an amended petition, [17] claimed ratable deductions for anticipated obsolescence of its grading and tunnel bores. [18]Section 167(a)[19] allows a reasonable allowance for obsolescence of property used in a trade or business. Section 1.167(a)-1, Income Tax Regs., provides that "The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate) * * *" over the "estimated useful life of the depreciable property * * *." Sec. 1.167(a)-1(a), Income Tax Regs. Useful life -- is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account *687 present conditions and probable future developments. Some of the factors to be considered * * * are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. * * * [Sec. 1.167(a)-1(b), Income Tax Regs.]
Normal obsolescence should be taken into account and may render the asset economically useless regardless of its physical condition. Sec. 1.167(a)-9, Income Tax Regs.
*688 We first held that a taxpayer's grading and tunnel bores could be ratably depreciated under section 167 in Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352 (1975). In that case we observed: Unlike physical exhaustion through use which more readily lends itself to empirical study and follows more predictable patterns, exhaustion through obsolescence often defies observation while in progress, succumbing to certainty only in retrospect. This is in part a reflection of the fact that obsolescence is to some extent a function of managerial policy rather than a physical phenomenon. Yet it is clear that, by including obsolescence within the ambit of section 167, the statutory scheme which demands to know the useful life of property prior to its expiration is sufficiently flexible to accommodate some degree of uncertainty and its concomitant inaccuracy. This practical concession to reality was recognized early by the Supreme Court in construing the depreciation provision of the Revenue Act of 1918 ( Burnet v. Niagara Brewing Co., 282 U.S. 648, 654-655): "* * * *689 Neither the cost of obsolescence nor of accruing exhaustion, wear and tear that is properly chargeable in any period of time can be measured accurately. A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." [Chesapeake & Ohio Railway Co. v. Commissioner, supra at 379.] The Chesapeake case did not establish, as a rule of law, that all grading and tunnel bores are ratably deductible, but the finding of a 100-year average useful life was based upon that taxpayer's particular facts and circumstances. In subsequent cases we have separately found that taxpayers had shown reasonably ascertainable useful lives for their grading and tunnel bores: Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497 (1980) (100 years for grading and 90 years for tunnel bores); Kansas City Southern Railway v. Commissioner,76 T.C. 1067 (1981) (grading 100 years and tunnel bores 75 years). Our opinions have recognized the inherently flexible nature of the statutory scheme, so that exact precision was not needed for taxpayers to prevail in their positions that grading *690 and tunnel bores are ratably depreciable. All taxpayers need do is establish that these assets have reasonably determinable useful lives. Clearly, "it would be unreasonable * * * to put upon the taxpayer the burden of proving to a reasonable certainty the existence and amount of obsolescence. * * * A reasonable approximation of the amount that fairly may be included in the accounts of any year is all that is required." Burnet v. Niagara Falls Brewing Co.,282 U.S. 648, 654-655 (1931).
Southern Pacific Transportation Co. v. Commissioner, supra at 790-791. Respondent points to a recent Court of Claims opinion where the taxpayer was unsuccessful in proving to the satisfaction of that court that their grading and tunnel bores had reasonably determinable useful lives. Burlington Northern, Inc. v. United States,676 F.2d 566 (Ct. Cl. 1982) (Burlington). The Court of Claims saw its "task" as "essentially factual in nature." (676 F.2d at 576). The major focus was upon the manner in which the methodology of determining useful life was applied, rather than upon the question of whether grading and tunnel bores were subject *691 to an allowance for depreciation. In Burlington an actuarial method was used resulting in a "stub survivor curve." The curve was "smoothed" and was matched by visual superimposition of Iowa curves over the smoothed stub survivor curve which had been derived from the actuarial analysis. This process requires judgment and the Court of Claims found that "[Burlington] has failed to show that it exercised its judgment properly in selecting the Iowa curve used in its analysis." Burlington at 577. The Court of Claims' holding was premised upon three major findings: (1) The relevancy of "Iowa curves" in determining the useful life of grading and tunnel bores; (2) the subjective quality of the process of selecting the proper curve, which was illustrated by the disparity between the useful lives presented by Burlington's experts; and (3) the lack of verification of the actuarial method by objective means, such as statistical verification procedures. Petitioner in this case used both the actuarial method and a method where the initial matching of the actual data to a proper fitting curve did not require much, if any, subjective judgment. Here, similar results were obtained through *692 both methods and we have taken the most conservative of the results of both as our holding. Although the actuarial method used is more subjective and judgmental, we were satisfied that petitioner's experts used sufficient care in their choices and that they possessed sufficient expertise to be able to rely upon their judgment. In the second methodology applied by petitioner (simulated plant method), the initial matching was accomplished by simulating the grading account data and, by means of a computer assisted comparison process, matching the data to the entire family of Iowa curves. This process resulted in narrowing the curve selection to the five best fitting curves. Thereafter, the curves were further objectively tested and a single curve was selected with the aid of a limited amount of subjective judgment. The final curve selection process was subjected to numerous objective statistical tests to insure that the simulation and curve selection fit the actual data. We are satisfied that the use of the simulated plant method is warranted and sufficiently accurate to provide a basis for determining the useful life of grading and tunnel bores. The use of this method and the objective *693 verification utilized by this petitioner, factually distinguishes this case from Burlington.
Although the Court of Claims was unable to see the "relevancy of curves [Iowa] reflecting the mortality characteristics of such diverse properties as submarine cable and railroad boxcars in estimating the probable retirement patterns of railroad grading and tunnel bores," (676 F.2d at 577) we are satisfied under this record that the Iowa curves can be effectively utilized in estimating and projecting the useful life of long-life assets. The experts provided by both parties agreed that the Iowa curves could be used to effectively estimate useful life. [20] The Iowa curves, however, have been effectively utilized for asset life analyses and approved by courts for many years. These curves represent a series of life patterns of various industrial assets which were developed at Iowa State University. The curves merely reflect the pattern of property retirements and it should not make a material difference if grading and tunnel bores were or were not included in this particular study. It would seem more important that the pattern of the particular long-life industrial assets *694 be included and represented in the curves. The 50-year history of the use of Iowa curves and the testimony of the experts have convinced us that use of Iowa curves was appropriate in this case. Respondent has presented the following positions in opposition to petitioner's depreciation claims: (1) Petitioner's attempts to ratably depreciate grading constitutes an impermissible change in the accounting method; (2) petitioner's attempt to depreciate grading constitutes nonallowable distortions of income; and (3) petitioner's depreciation calculations are erroneous because petitioner failed to account for salvage or allowed or allowable depreciation. The change of accounting method was unsuccessfully advanced in Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352 (1975); *695 Southern Pacific Transportation Co. v. Commissioner,75 T.C. 497 (1980); and Kansas City Southern Railway v. Commissioner,76 T.C. 1067 (1981). Respondent requests that we reconsider our holdings in the above cases based upon the facts in this joint record. We find nothing in this record or that of the companion case (Seaboard Coast Line) which would cause us to vary from our prior opinions, and we so hold. As to the "distortion" argument, respondent argues that the depreciation of grading for the years in issue would exceed the amount of all prior retirements. [21] We have no way to relate to respondent's argument, because the cost or value of retirements are not indexed and, additionally, we cannot relate to any pattern of retirements from respondent's argument. We find respondent's argument to be interesting, but unpersuasive. Respondent's salvage value argument has been addressed in prior railroad opinions. *696 Respondent argues that petitioner has failed to ascertain the salvage value of grading which would have shown that it had a residual value. In Chesapeake & Ohio Railway Co. v. Commissioner, supra at 369, we found that "neither grading nor tunnel bores have any salvage value upon retirement." In this case respondent contends that the retired railroad grading may be used as a roadbed, constitutes an improvement to land regarding improved drainage patterns, and retains value in condemnation settings. The evidence presented in the record does not support respondent's contentions. [22] We have found that the majority of grading retirements is due to obsolescence rather than "wear and tear." Based upon the nominal evidence of residual value to railroad grading, we must find, as we did in Southern Pacific Transportation Co. v. Commissioner, supra at 802, "that, on balance, the grading * * * had only a nominal value upon cessation of use, and we conclude that petitioner is justified in its contention herein that the properties at issue would have no salvage value upon their retirement. *697 See Massey Motors v. United States, 364 U.S. at 92 (1960); sec. 1.167(a)-1(c), Income Tax Regs." Respondent's "allowed or allowable" argument advances the position that any of petitioner's pre-1913 depreciation should not be utilized in the depreciable base and that the depreciation that was "allowed or allowable" for post-1913 years, prior to the first taxable year under consideration, should be reduced from the depreciable base. Respondent's rationale is that petitioner points out the paradoxical quality of respondent's position, because it presumes the allowability of depreciation with respect to grading, something which respondent has vigorously *698 argued against. Prior to a line of cases beginning in 1975 with Chesapeake & Ohio Railway Co. v. Commissioner, supra, there was no precedent for a deduction for the obsolescence of grading or tunnel bores. It was only after that opinion that various railroad companies began to claim these deductions. Prior to that time petitioner used the retirement-replacement-betterment (RRB) method of accounting. Under that method retirements from the grading account were at the cost of reproduction new, which would have the same overall effect as depreciation deductions. Furthermore, the retirements have occurred over a period of time to appropriately adjust for inflationary factors. Under these circumstances, we believe that prior depreciation was, in effect, removed from the balance of the grading account. To the extent indicated herein we find this issue for petitioner. Petitioner is entitled to deductions attributable to the obsolescence of grading based upon a 135-year useful life with a 84.7-year average remaining life based upon an 1966 average life. Petitioner is entitled to deductions attributable to obsolescence of tunnel bores based upon a 135-year useful life *699 with a 75-year average remaining useful life, based upon a 1966 average useful life. Relay Rail
The parties have stipulated for purposes of this case that L&N would be bound by the lesser of the salvage value for relay rail determined in the companion SCL case or the amount that had been allowed by respondent in his determination in this case. We sustained respondent's determination of $ 85 in the companion SCL case and the parties can take that into consideration in their Rule 155 computations. In the companion SCL case we addressed the question of whether petitioner would be entitled to utilize the procedures of Rev. Proc. 68-46, 1968-2 C.B. 961, in order to determine the proper allowance in lieu of depreciation and/or abandonment losses where relay rail was picked up in retirements. The companion case presented alternative computations in the notice of deficiency based upon use of Rev. Rul. 67-145, 1967-1 C.B. 54, and Rev. Proc. 68-46, 1968-2 C.B. 961. The L&N notice of deficiency does no appear to have alternative determinations, or is there any indication whether respondent utilized either the procedures of the revenue ruling or *700 revenue procedure. For the reasons expressed at pages 44 through 47 of our opinion in the SCL companion case, we hold that L&N would, to the extent appropriate, [23] be entitled to utilize the procedures of the revenue procedure, including the 20-year adjustment approach to inclusion of the so-called "ending inventory." Casualty Loss - Hurricane Betsy
This issue focuses upon petitioner's entitlement to a deduction for the cost of repairing and/or replacing the grading which was damaged as a result of Hurricane Betsy in 1965. Petitioner seeks to deduct the entire $ 700,775.12 expended, in connection with grading, as a maintenance or repair expenses under section 162. Respondent argues that petitioner would be limited to its adjusted basis of the grading lost as a result of the hurricane or casualty under section 165. The issue essentially requires us to make a determination of whether this is a deductible expense or a capital item. [24] More specifically, petitioner contends that the replacement and repair of *701 the grading is a normal item of expense and that the magnitude of the damage and repairs or the suddenness of the event should not matter. Respondent contends that petitioner's loss here was a capital one and that petitioner's accounting method and position taken in litigation regarding the grading are incongruous and incorrect. We agree with respondent. *702 Petitioner relies on R. R. Hensler, Inc. v. Commissioner,73 T.C. 168 (1979), wherein we decided that certain repairs made to business assets caused by flooding were deductible under section 162 as ordinary and necessary business expenses. In that case we were confronted with the same statutory dichotomy between sections 162 and 165. Damage had been caused to machinery and equipment by the flow of mud and water. The cost of cleaning and repairing the machinery was our focus in R. R. Hensler, Inc., supra.To petitioner the difference is significant because petitioner would only be entitled to deduct its adjusted basis for the damaged grading and capitalize the larger capital expenditure if we determine that section 165 applies and the repairs were capital in nature. If, on the other hand, we determine that the repairs or replacement was an item of expense, the entire amount would be deductible in the taxable year and petitioner would not be required to amortize the cost over the useful life of the grading asset. We are confronted here with assets used in petitioner's business which were not totally lost or destroyed by a hurricane, but were *703 substantially damaged and physically moved from their proper situs. As we determined in R. R. Hensler, Inc., supra at 178-182, a deductible repair expense may occur where there is not a complete replacement of an asset. Here, however, the track structure and grading were modified or moved from the original location by the force of wind and water. Although petitioner was able to move the track structure and some of the recoverable grading material back to the original location, the grading and track were replaced after the initial relocation to the original situs. "While the amounts [involved] are large, we do not believe that factor is controlling (see Welch v. Helvering, [290 U.S. 111 (1933)]; American Bemberg Corp. v. Commissioner, [10 T.C. 361 (1948), affd. per curiam 177 F.2d 200 (6th Cir. 1949)])." R. R. Hensler, Inc., supra at 182. The important factor here is that petitioner did not merely repair the track and grading; it essentially and substantially replaced them. Petitioner was subjected *704 to a "casualty" within the meaning of section 165 and sought insurance recovery and is entitled to deduct adjusted tax basis to the extent not compensated for by insurance or otherwise. Dead Haul Issue
L&N rebuilds freight cars in its South Louisville, Kentucky, shops. In a prior opinion involving petitioner, we held that labor costs for vacation pay, holiday pay, payroll taxes, health and welfare benefits, applicable to the direct labor used in the rebuilding should all be capitalized. Louisville & Nashville Railroad Co. v. Commissioner,66 T.C. 962, 982-988, 1010-1016 (1976). [25] In that same case we also held that the costs of hauling materials used in capital programs (dead haul) should be capitalized at a rate of 6.06 percent of material costs. Louisville & Nashville Railroad Co., supra at 985-986. The 6.06-percent figure was derived from ICC studies and was used by petitioner. Petitioner does not dispute that these "dead haul" costs should be capitalized in accord with our former opinion. Petitioner does *705 not agree with the amount that should be capitalized. Respondent determined, in accord with the finding of our prior opinion, that the capitalization should be at the rate of 6.06 percent of material costs. Petitioner offered M. L. Jameson (Jameson), an employee of petitioner's successor, who has been involved with railroad costing and economic work for 16 years. Through this witness petitioner offered a computation which resulted in a $ 130-per-car "dead haul" cost. The $ 130-per-car figure represents about one-half of the 6.06 figure previously utilized. Jameson's computation was not shown to be any more accurate than the 6.06 amount petitioner had utilized, ICC had developed and this Court had previously approved. We hold, as we did in the prior case that involved this petitioner, that "dead haul" costs should be capitalized at a cost of 6.06 percent. To reflect the foregoing and concessions and agreements of the parties, Decision will be entered under Rule 155.
Footnotes
1. Attorney George K. Dunham died after the briefing was completed and before the issuance of this opinion. ↩
2. Also involved in this case are the taxable years 1965, 1967 and 1968 to the extent of carryback and carryover losses claimed and in issue. ↩
3. The parties have stipulated that our findings with respect to the "salvage value" of relay rail redetermined in our opinion concerning Seaboard Coast Line Railroad Company, Successor by Merger to Atlantic Coast Line Railroad Company, docket number 4870-75, or the amount determined in the notice of deficiency by respondent in this case, whichever is less, shall be binding upon the parties. ↩
4. The reports and testimony of certain experts, some stipulated facts and other matters, to the extent appropriate, are being considered applicable in either case. Louisville and Nashville Railroad Company is now part of the Seaboard Coast Line Railroad Company conglomerate, but its petition was filed before it was merged. Although two of the issues presented in these two cases are essentially the same (depreciation of grading and tunnel bores and the value of salvaged relay rail), both issues are essentially factual and are being treated in separate opinions. ↩
5. ICC annual reporting requirements include predefined uniform accounts for the various categories of assets, expenditures, etc. ↩
6. The decision to retire a line from service must be approved by Federal and state regulatory authorities. In considering an application to abandon service, the ICC considers public benefit as well as profitability. The potential for opposition of the public is considered in any decision to abandon a line. ↩
7. Raab was used in the companion case involving SCL, where SPR was the sole analysis used by petitioner in that case. SPR is used where there is less available data and is the most accurate method under those circumstances. In this case there was sufficient data to use the actuarial method and the SPR was used as a second method. ↩
8. Winfrey, Robley, Statistical Analyses of Industrial Property Retirements, Engineering Research Institute, Iowa State University, Ames, Iowa (1935). ↩
9. Sometimes referred to as the "stub curve" because it only shows the experience for a part of the asset's life and is necessarily truncated. ↩
10. Where retirement occurs predominantly before the expectation of the average life it yields a left-moded curve (L Curve). Where retirement occurs predominantly after the expectations of the average life it yields a right-moded curve (R Curve). Where retirement occurs equally on both sides of the average life it yields a symmetrically-moded curve (S Curve). ↩
11. A conformance index measures the quality of the fit of the survivor curve to the size of the grading account. The index number is composed of two components: (1) The standard error of the estimate measured as the square root of the average squared difference between the actual and simulated balances; and (2) the average actual balance over the years in question. The conformance index is the ratio of these two components. ↩
12. A retirement experience index measures the degree to which judgment must be used in the selection of the most appropriate survivor curve. This index is composed of the percentage of accumulated retirements of the first years' additions in the account, assuming the selected survivor curve describes the mortality characteristics of the account. ↩
13. A parameter stability test is used to determine the consistency of the survivor curve using different bands of years of experience. The test is accomplished by analyzing different band years of data in which the sum of the squared deviations of actual and simulated balances is minimized to determine the best fitting survivor curve shape and life. ↩
14. This particular area has historically been subjected to similar storms and damage. From 1881 through 1965, 12 such incidents have been recorded and another one occurred in 1969. ↩
15. That case involved the taxable years 1955 through 1963 and 1964 because of carryback losses claimed in earlier years. ↩
16. Petitioner determined the number of rebuilt freight cars from their ICC Form A. The method of reporting rebuilt freight cars on the Form A included cars that may have been completed in had been completed in the current year and had not been costed. This variation in petitioner's method of determining the number of rebuilt cars caused a 30 car discrepancy between respondents adjustment and petitioner's claim. Respondent utilized 3,318 rebuilt cars for his 1966 computation (whereas petitioner claimed 3,288) based upon records maintained by petitioner. Respondent did not provide amounts for carryover loss years. Because this affect the 1966 taxable year from 1965, 1967 or 1968, a consistent pattern, we have utilized petitioner's numbers from the Form A's and the parties may make any appropriate adjustments in their Rule 155 computations. ↩
17. Petitioner did not claim deductions for obsolescence of its grading and tunnel bore on the Federal income tax return for the taxable year 1966. The first case in which ratable deductions of this kind were allowed was Chesapeake & Ohio Railway Co. v. Commissioner,64 T.C. 352↩ (1975). 18. In the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, Congress added sec. 185 permitting railroads a 50-year amortization of grading and tunnel bores placed in service after Dec. 31, 1968. Sec. 185 was amended in the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, permitting amortization after 1974 for grading and tunnel bores permitting amortization after 1974 for grading and tunnel bores acquired prior to 1969. Sec. 185 has no retroactivity to the years before us in this case, nor does it preclude petitioner herein from claiming deductions for years which are not covered by sec. 185. ↩
19. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years and period in issue. ↩
20. Respondent's expert (Singpurwalla) believed that more advanced and exact statistical methodology has been developed since the development of the Iowa curves (1935). He believed, however, that the simulated plant method, actuarial method and Iowa curves could be used in life analyses. Respondent's expert's concerns with this methodology was the statistical quality of the result. They were dissatisfied with the scientific exactitude of this methodology. ↩
21. With respect to the amount of depreciation being claimed in the 5 taxable years and 1 taxable period of the SCL companion case, respondent argued that the total amount being claimed exceeded all prior retirements up to that time. ↩
22. Respondent's contentions are no less likely than petitioner's. Petitioner suggests that most of the grading is eventually used as farmland and that the grading in that context is a detriment, rather than being valuable. Respondent envisions condemnations for other purposes, such as an automobile roadbed. In any event, the retirements reviewed in this case do convince us that respondent's contention should not be considered significant enough to change the outcome of this issue. ↩
23. Any differences of the parties regarding the appropriateness of using the revenue ruling or revenue procedure can be addressed in the Rule 155 computations. ↩
24. We do not intend to imply that someone who is entitled to a deduction under sec. 165 due to a casualty loss is precluded from deductions for ordinary and necessary business expenses in connection with the particular assets subject to the casualty. That is, however, the manner in which the issue is confronted in this case. Respondent contends that petitioner is limited to the deduction of its adjusted tax basis in the grading and that the grading added is a capital item. Petitioner for some reason, possibly attributable to unique concepts of railroad accounting, seeks merely to deduct the $ 700,775.12 expenditure for grading and no casualty loss attributable to the grading in place that has been lost. We additionally infer from the manner in which respondent has argued, that petitioner is entitled to a $ 92,019.18 casualty loss under sec. 165, even if we were to totally agree with respondent's position. ↩
25. That case involved the taxable years 1955 through 1963 and 1964 because of carryback losses claimed in earlier years. ↩